SMIZEL v. ODANAH IRON CO.

1. NEGLIGENCE—INJURY TO EMPLOYÉ—MINING OPERATIONS—PLATFORM IN SHAFT—DEFECTS IN CONSTRUCTION—EVIDENCE.

A plank in a platform constructed in a mining shaft was disturbed by blasting at a lower level, and plaintiff, an employé in the mine, while attempting to cross such platform, fell and was injured. Upon the question of fact whether the planks were spiked down, the workman who supervised the construction of the platform, and a shift-boss who was with plaintiff at the time of the injury, testified in the affirmative. The latter further testified that, upon replacing some of the planks after the explosion, the spikes fitted the same holes they had been drawn out of; that the planks "went down even" at the first effort, with no more force applied than simply stepping upon them. A fellow workman testified that he saw no spikes in the plank, and other witnesses testified that blasts such as the one used would not be likely to disturb a platform if spiked down. Held, that, upon the whole evidence, the question was for the jury.

2. SAME—INSTRUCTIONS.

An instruction that the company would be liable to plaintiff for his injuries if the platform in question was insufficient and unsafe for such general use as the company was putting it to, and was liable to be loosened by explosions in the shaft below, was not objectionable as withdrawing from the jury the question as to whether the accident to plaintiff was one which the company might reasonably have anticipated, when it was given in connection with instructions that the burden was upon plaintiff to show that the platform was not such a one as a reasonably prudent company would, under the circumstances, have erected, and that no presumption of want of reasonable care arose from the fact of the planking's being disturbed by the firing of the blast, and that such care would not require the company to build a platform which could not be disturbed by blasts below, unless experience had shown that such blasts would probably disturb such platform.

3. SAME—INTERVENING CAUSE.

The company was bound so to construct the platform that it should be capable of withstanding the strain to which the ordinary operations of the mine would subject it; and if the platform became loosened under the strain of such ordinary operations, by reason of defects in the original construction, the company would not be entitled to have the operations themselves treated as an intervening cause of injuries to a workman under whom it gave way.

Error to Gogebic; Haire, J. Submitted January 4, 1898. Decided March 15, 1898.

Case by Wenzel Smizel against the Odanah Iron Company for personal injuries. From a judgment for plaintiff, defendant brings error. Affirmed.

Charles E. Miller (Fish & Cary, of counsel), for appellant.

J. J. Patek (Charles A. Withey and C. F. Button, of counsel), for appellee.

MONTGOMERY, J. This is an action for negligent injury. On the 26th of February, 1890, the defendant was the owner of the Cary Mine. At this mine was a

shaft known as "No. 1 Shaft," which shaft was about 148 feet deep. The first level of said shaft was about 35 feet from the surface, the second level about 50 feet below the first level, and the third level 63 feet below the second level. Shortly before the day in question, the defendant company caused a platform to be built at the second level above mentioned. The shaft at that point was about 8 by 10 feet across, and the platform was about 10 by 12 feet; the planks of the platform projecting onto the rock at each edge of the shaft. This platform was built of timber 8 by 10 inches in diameter, and three timbers running crosswise of the shaft. On these timbers were laid 2-inch planks. Through this platform was a hole used for the skip-road, which hole was about 4 feet 6 inches square, and near that hole was what was known as the "manhole" or "ladder-way;" being a hole through which men passing up and down the ladder-way might pass, which was sufficiently large to admit of the passage of a human body of ordinary size. The platform in question extended over the entire shaft, except for the holes above mentioned. As to whether the planks were spiked down is a matter of controversy. Defendant's counsel contend that the undisputed testimony shows that they were, while plaintiff's counsel contend that it was a question for the jury.

On the day in question, the plaintiff, together with another workman at the Cary Mine, named Prelomski, were engaged, together with the shift-boss, whose name was Matthews, in building what is known as a "skip-rest," just beneath the surface of the platform. This skip-rest was built of timbers, and was located about six feet below the level of the platform, and was used for the purpose of allowing the skip to rest thereon while the same was being loaded. At the third level, 63 feet below, the miners were engaged in mining ore by blasting and drilling and picking, and the testimony shows that at the third level a drift had been mined out to the east and to the west of the shaft in question, to the east about 25 feet and to the west about 15 feet, and blasting was going on at the end of one

of these drifts, but whether in the east or west drift is not shown by the evidence in this case. While the plaintiff and shift-boss and Prelomski were thus engaged in building the skip-rest, warning was given by the miners below that they were about to fire a blast, and the shift-boss ordered the two men who were working with him to leave the place where they were working, under the platform, and all three went up onto the platform, thence east across the platform into a drift, and through a door into what is known as the "open pit." After these three persons had arrived at the open pit, the blast was fired, and the shift-boss stepped out to the shaft, and found it filled with smoke. He then noticed that some of the planking of the platform at the second level had been disturbed by the blast, and he and some miners who were on the west side of the shaft took hold of the planks which had been disturbed, and laid them down flat upon the platform as they had been originally. The planks which the shift-boss thus rearranged were the long planks, being about 12 feet long. Between the hole made by the skip-road and the edge of the shaft the planks were short, being approximately 6 feet long. The shift-boss testified that he did not notice that any of the short planks were disturbed or overthrown.

After the shift-boss had thus rearranged the platform, he called to the men who were in the open pit to come up the ladder, and go over into another shaft to work; and the shift-boss walked across the platform to the ladder-way, followed by Smizel, the plaintiff, who was in turn followed by Prelomski. As the shift-boss started up the ladder-way, Smizel fell, and it is claimed by him that he stepped upon a plank which had been blown loose by the explosion, which slipped with him, and that he then fell through the hole made in the platform, falling to the bottom of the shaft, by which he was seriously injured. None of the timbers in the platform were disturbed, nor were any of the planks composing the platform broken. The platform in question was built under the supervision of

one Thomas Bolitho, who, so far as appears in this case, was entirely competent to do that work. This platform in question was used simply for men to stand upon and to pass over. It is claimed by the defendant that the undisputed testimony shows that a platform such as this was the usual and customary platform used in the mines in this locality for the purpose for which this platform was intended. It is further claimed by the defendant that the probability of the platform's being disturbed by blasting below, under circumstances such as were shown in this case, was very remote, and that it was not such an occurrence as would be taken into consideration or as would be apprehended by reasonably prudent mining men.

As the plaintiff's counsel concede the importance of the question of fact as to whether the planks were spiked, it is necessary to look into the record to ascertain whether defendant's contention that the evidence was conclusive of the fact should be sustained. Two witnesses for the defendant testify that the planks were spiked, viz., Matthews and Bolitho. Matthews was the shift-boss, who testified that, after the explosion, boards were torn up, and he replaced them. He was asked, "Do you know whether those planks were spiked?" and answered, "Yes, sir; they were spiked." He further testified as follows:

"Q. What did you do with the spikes when you put them down?

"A. The spikes went right down.

"Q. You mean the spikes fit the same holes they had been drawn out of?

"A. They might have. The boards went right down just as even as they are there [pointing to the model].

"Q. What I want to find out is, when you jumped onto the plank you jumped on so that the spikes went right down into the timbers again?

"A. Perhaps so. They went down even."

He also testified that he used no hammer, and that it took him but a very short time to replace the planks. Bolitho, who built the platform, testified that he spiked the plank down. On the part of the plaintiff, Prelomski, who was working with plaintiff, testified:

"I didn't see any nails in the loose plank after Smizel went through. If there were spikes in it, sure I must have seen it; I would have seen it."

On cross-examination he testified as follows:

"*Q.* Do you know whether there were any spikes in it at that time or not?

"*A.* I didn't see any spikes in the plank.

"*Q.* Did you look to see whether there were any in it or not?

"*A.* If there were spikes there I would have seen it; everybody would have seen it.

"*Q.* Did you look to see whether there were any spikes in it or not?

"*A.* No.

"*Q.* Did you see any spikes in the other planks?

"*A.* No, sir.

"*Q.* Do you know whether there were any or not?

"*A.* I didn't see any.

"*Q.* Do you know whether there were any?

"*A.* I don't know; I couldn't say that.

"*Q.* Could you have seen spikes if there were spikes in the other planks?

"*A.* If there was, the spike is so long I could see it.

"*Q.* Suppose the spikes were the other side down?

"*A.* I think if the spikes were in there the planks wouldn't set level; it would be kind of tipping on each side.

"*Q.* Did you say that you know there were no nails in that plank?

"*A.* I couldn't say sure, but I didn't see them.

"*Q.* You didn't look for them, did you?

"*A.* No.

"*Q.* You were pretty badly frightened, weren't you?

"*A.* I was scared awful much, but I would see it some way if there were spikes in there. My foot or something would probably touch it.

"*Q.* You wouldn't necessarily touch a spike with your foot, would you, that was in this plank?

"*A.* I didn't see it. I went over that plank to get to the ladder-way. I was excited and frightened.

"*Q.* When you started to go you were in a hurry, weren't you?

"*A.* Sure, there was nothing to look around.

"*Q.* And you didn't pay much attention to whether

there were nails in the plank or not, as you were in a hurry to get to the ladder? Isn't that right?

"*A.* I couldn't say sure.

"*Q.* There might have been spikes in that plank without your seeing it, might there not?

"*A.* About the spikes I couldn't say, because I haven't seen them.

"*Q.* You couldn't say whether they were there or not, because you didn't see them?

"*A.* No; I didn't see them, if there was or not."

This cross-examination materially impairs the force of the testimony of this witness; but should we say that there was no question for the jury on this point? We think not. Defendant called witnesses who testified that blasts such as used in the mine would not be liable to disturb such a platform if spiked down, and the cross-examination of Matthews tends strongly to show that the planks were not spiked. It was certainly a very remarkable fact that these planks, if they were spiked, torn loose as they were, should have been by the first effort replaced in such a way that the spike would exactly fit the hole it had previously made, and that they should go into place with no more force applied than simply stepping on them. This question was, on the whole record, a question for the jury.

An examination of the record satisfies us that it did not appear by the undisputed testimony that the platform in question was the usual and customary platform used in the locality. On the contrary, there was evidence that such platforms were in many instances constructed with a double thickness of plank. The jury, in answer to a special question submitted to them by defendant, found that the platform was not such a one as was usually and customarily adopted by mining companies in that locality.

The theory on which the case was given to the jury is indicated by the following extract from the charge:

"Now, gentlemen, in this case, the plaintiff claims, and has introduced testimony which he claims tends to show, that in February, 1890, in the State of Wisconsin, he was

employed in the Cary Mine by the defendant, the Odanah Iron Company, as a common laborer, and that while so employed he was injured, and that he was injured by reason of the improper construction of a platform in one of the levels at defendant's mine; and he claims that, by reason of that improper construction of a platform, he was injured, and therefore he claims damages at your hands. In other words, he claims that the original construction of this platform in question was not proper; was not safe; was not so constructed that it was a safe place to work. The defendant, on the other hand, has introduced testimony which it claims tends to prove that this platform in question was properly constructed; that it was constructed as such platforms are ordinarily and usually constructed, and with due care, having in view the safety of persons that worked thereon and the uses to which it was to be put. If you find that that is the case, then, even though the plaintiff was injured, he cannot recover, because it would be one of the risks of his employment, and he would have to suffer the consequences if he was so injured.

"That, in general, gentlemen, is the case that we have for you to consider today. I charge you more specifically on that subject, gentlemen, that it was the duty of the defendant in this case to make and keep its shafts where it placed plaintiff to work, and every part thereof, in a condition which was reasonably safe, under all the circumstances surrounding the situation. This applies to defendant's platform at the second level, where the plaintiff was hurt; and the defendant's care should have been equal to the risks of the business in which it was engaged. The work of mining is always attended with more or less danger. Those engaged in the business know the fact, and it is their duty to use enough diligence and care in preparing their premises, structure, and appliances so that no more than the usual and ordinary risks would attend the work which they require of the men in their employ. If the defendant failed to do this, and solely because of that failure the plaintiff was injured, substantially as claimed in his declaration, and as shown by the evidence, he is entitled to recover, and your verdict should be in his favor. *The defendant was bound to know all the consequences which usually attend such operations as it was carrying on at the time in question;* and, if explosions in the drifts below the platform on the second level were liable to disturb and disarrange the platform,

it was bound to know it, and to take all necessary and reasonable precautions to prevent such a thing happening in the ordinary course of its business, and to take all precautions that it could well and reasonably take to so construct and keep the platform in question strong, and all parts thereof in place, so that the plaintiff could safely go over it and go upon it, as the work required of him made it necessary. If the defendant failed to do this, and failed to exercise such care as it reasonably should have done under all the circumstances, and because of that the plank or planks of the platform were blown or became disarranged, and the plaintiff, without fault on his part, fell through and received the injuries in question, then your verdict should be for the plaintiff."

The defendant's counsel requested the court to direct a verdict for the defendant for the following reasons:

"(*a*) The proximate cause of the injury to the plaintiff was, as appears from plaintiff's evidence, a defect in the platform, in that one of the planks thereof had become loosened by an explosion immediately before the injury, so that, when plaintiff placed his weight thereon, the plank slid forward, and the plaintiff was precipitated through the hole thus made in such platform.

"(*b*) While it is the duty of the master to use reasonable care to provide employés with a safe place to work and with safe implements, still the duty thus imposed is only to use reasonable care under the then existing circumstances; and it appearing by the undisputed testimony that the alleged defect in the platform was the result of a sudden explosion, and that the defendant had had no time to make a thorough investigation previous to the injury complained of, the defendant cannot be said to have been negligent in this case.

. "(*c*) The plaintiff and his fellow-servants had as good or a better opportunity to discover the alleged defect in the platform than the defendant had at that time, as appears from the undisputed evidence in this case, and, that being so, the plaintiff cannot recover in this case."

It is also assumed by counsel that certain specific requests were also presented orally, which the court refused; but this assumption is not borne out by the record. The record discloses that, at the close of the testimony, the defendant's counsel orally requested the court to instruct

a verdict for defendant for certain specific reasons. This was denied, and then the counsel requested the court in writing to direct a verdict for the reasons above set out. It is apparent, therefore, that the only questions which we can consider are whether there was a case for the jury, and, if there was, whether the court committed error in his charge to the prejudice of the defendant. It is contended that the injury to the plaintiff was not the proximate result of fault of construction. It is said that one is responsible for only such consequences of his fault as are natural and probable, and that if his fault happens to combine with something extraordinary, and not likely to be foreseen, he will not be responsible for the unexpected result. We think it would be a misapplication of this principle to rule the present case by it. It is apparent that this platform was built with a knowledge that it was likely to be subjected to the strain caused by explosions in the shaft beneath it. It was built as a structure more or less permanent, and the servants of the defendant had the right to assume that it would stand the test to which the ordinary operations of the mine subjected it. Such ordinary operations cannot be treated as constituting an intervening cause.

It is also contended that the court erred in instructing the jury as follows:

"It is claimed by the plaintiff that this platform in question was not strong, thick, and substantial, as it should have been, and that it was not properly nailed or fastened down, and was insufficient and unsafe for such general use as the defendant was putting it to, and was liable to be blown up, disturbed, and loosened by explosions in the drifts below, such as the defendant caused to be made. If you find this to be true, under the evidence in the case, it was negligence in the defendant, and your verdict should be for the plaintiff."

It is insisted that the question whether such an accident is one which would have been likely to happen, and should have been anticipated, was by this instruction withdrawn from the jury. It is scarcely necessary to say that the

charge should be construed as a whole. When so construed, we are satisfied that it is not subject to the criticism stated. In other portions of his charge the court covered this point fully:

"*In order for the plaintiff to recover in this case, he must establish by a clear preponderance of the evidence that the platform as constructed was not such a one as a reasonably prudent mining company would erect under the circumstances, with reference to the safety of the parties working thereon or passing over the same.*

"*The mere fact that the planking of the platform in question was disturbed by the firing of blasts would not necessarily raise the presumption that the defendant did not exercise reasonable care in the erection thereof. It was only one of the circumstances bearing on the question of whether or not it was properly constructed.* \* \* \*

"Reasonable care on the part of the defendant would not require it to build a platform which could not be disturbed by blasts fired in the level below, unless experience had shown that such blasts in the drifts in the level below would probably disturb such platform."

While numerous errors are assigned on the charge of the court, we think the foregoing discussion and the special findings of the jury sufficient answer to all.

A motion for a new trial was made and overruled, and error is assigned on the ruling. We are satisfied, on a careful examination of the record, that the verdict is not so clearly against the weight of the evidence as to indicate that it was influenced by passion or prejudice, or was not the result of the deliberate and fair judgment of the jury.

Judgment affirmed.

The other Justices concurred.